# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

\*\*\*

UNITED STATES OF AMERICA,

                    Plaintiff,

vs.

DENNIS MCPHERSON,

                    Defendant.

Case No. 2:15-cr-00266-LDG-VCF-1

**REPORT & RECOMMENDATION**

SEALED MOTION TO SUPPRESS EVIDENCE OBTAINED THROUGH ELECTRONIC SURVEILLANCE (ECF NO. 124)

The Government used wiretaps to investigate an alleged drug trafficking organization run by Dennis McPherson and his associates. Before the Court is Defendant Dennis McPherson's Sealed Motion to Suppress Evidence Obtained Through Electronic Surveillance. (ECF No. 124). Co-Defendants Mark Lloyd, Timothy McPherson, and Jay Saletra have moved to join that Motion. (ECF Nos. 125, 128, 132). The Government filed a Response to McPherson's Motion to Suppress. (ECF No. 130). McPherson filed a Reply. (ECF No. 138). The Court held a hearing on May 1, 2017.[1] (ECF No. 140). For the reasons stated below, McPherson's Motion to Suppress should be denied.

## I.  Background

In March 2014, a Confidential Source ("CS") provided information to the Las Vegas District Office ("LVDO") of the Drug Enforcement Agency ("DEA") about Dennis McPherson and his associates distributing oxycodone in Nevada and throughout the western United States. ECF Nos. 1 at 2; 124-1 at 26-27, 47. McPherson's network of about 40 associates first obtained oxycodone prescriptions from a

---

[1] The Court notes that McPherson withdrew his arguments for suppression of the wiretap extension due to alleged filing failures set forth in Section V(A), at pages 36-38, of McPherson's Motion to Suppress. *See* ECF Nos. 124 at 36-38; 138 at 3. McPherson confirmed this at the hearing held on May 1, 2017. *See* ECF No. 140.

doctor. ECF No. 124-1 at 26-27. They then sold the oxycodone pills to McPherson for an agreed upon price per pill. ECF No. 124-1 at 26-27. McPherson sold those oxycodone pills to out-of-state residents for a substantial markup in price. *Id*.

As part of this scheme, McPherson used his cell phone number to communicate with potential sources and buyers of oxycodone pills. *Id*. Nearly 14 months after the DEA began its investigation, it sought and obtained authorization to wiretap McPherson's (702) 682-7512 cell phone ("Target Telephone #1"). *Id*. at 4, 63.

The Government first began monitoring and intercepting wire communications to and from Target Telephone #1 in June 2015. *Id*. at 96-97, 287. On June 2, 2015, Deputy Assistant Attorney General Kenneth Blanco authorized the Las Vegas United States Attorney's Office to apply for a wiretap interception. *Id*. at 14. The next day, Assistant United States Attorney ("AUSA") Robert Knief filed the wiretap application. *Id*. at 4. The application included a 47-page affidavit from DEA Task Force Officer Jarrod Grimmett. *Id*. at 16. On the same day, United States District Judge Jennifer Dorsey authorized the wiretap for 30 days, starting the day the interception began. *Id*. at 66.[2]

The DEA began monitoring and intercepting wire communications to and from Target Telephone #1 on June 9, 2015. *Id*. at 96-97. Various Progress Reports were filed. *Id*. The wiretap ended on July 8, 2015. *Id*. at 287. On July 13, 2015, AUSA Knief filed (1) an ex parte motion to seal and store the intercepted wire communications; (2) a signed order from Judge Dorsey to seal and store those communications; and (3) another progress report. *Id*. at 132, 134, 136. On that same date, Officer

---

[2] On June 9, 2015, AUSA Knief filed a supplemental application and amended affidavit by Grimmett stating McPherson had changed phones (but still used the same cell phone number), requiring an amended order under a new international mobile subscriber identity ("IMSI"). *Id*. at 74. That same day, the authorizing court issued an Amended Order. *Id*. at 85. On June 10, 2015, AUSA Knief provided the authorizing court with a second supplemental application for a new IMSI, but the application was not filed until August 12, 2015. *Id*, at 175. The authorizing court issued a Second Amended Order on June 10, 2015, but was not filed until August 12, 2015. *Id*. at 187.

Grimmett sealed the DVD containing the intercepted communications, with AUSA Robert Knief as witness. ECF No. 124-1 at 287.

A few days after the first wiretap terminated, the Government sought an extension to continue wiretapping Target Telephone #1—McPherson's (702) 682-7512 cell phone number. *Id*. at 293; 130 at 31. Deputy Assistant Attorney General Kenneth Blanco authorized AUSA Knief to seek an extension on July 14, 2015. *Id*. at 302. AUSA Knief completed a wiretap extension application on July 15, 2015. *Id*. at 301. The application included a 50-page affidavit from DEA Task Force Officer Jarrod Grimmett. *Id*. at 304. The application and affidavit were reviewed and signed by United States District Judge Kent Dawson on July 15, 2015, but were not filed with this Court until March 7, 2017—the day after McPherson filed his Motion to Suppress. *Id*. at 301, 354; 130 at 31, 43. Judge Dawson signed the order authorizing the wiretap extension. *Id*. at 204.

The Government continued monitoring and intercepting wire communications to and from Target Telephone #1 beginning on July 17, 2015. *Id*. at 156-157. Various Progress Reports were filed. *Id*. The wiretap extension ended on August 13, 2015. ECF No. 124-2 at 3. AUSA Knief signed an ex parte motion to seal and store the intercepted communications on August 12, 2015, but filed it with this Court on March 7, 2017. ECF No. 130 at 95. On the same day, Judge Dorsey signed the order to seal and store the intercepted communications, but it was not filed until March 7, 2017. *Id*. at 97. On August 14, 2015, Officer Grimmett sealed the original DVD containing the intercepted communications with AUSA Knief as witness. ECF No. 124-2 at 3. Other progress reports were filed. ECF No. 124-1 at 238.

The Government filed a single-count Complaint against McPherson and five co-defendants (Susan Cope, Mark Lloyd, Alex Hong, Jay Saletra, and Timothy McPherson) on August 20, 2015. ECF No. 1. On September 22, 2015, the Government charged McPherson and five co-defendants in a single count indictment with conspiracy to distribute oxycodone, a Schedule II controlled substance, under 21 U.S.C.

3

§§ 841(a)(1), (b)(1)(C), and 846, from April 2014 until September 2015.  ECF No. 22.  McPherson pled not guilty.  ECF No. 124 at 14.

McPherson moves to suppress all evidence obtained from the two wire intercepts because allegedly (1) the original wiretap application failed to show necessity and probable cause; (2) the original wiretap application's failure to show necessity and probable cause tainted the extension application; (3) the extension for the wiretap fails to independently show necessity and probable cause; and (4) *Franks* errors in the supporting affidavits for both the original wiretap and the wiretap extension defeat findings of necessity and probable cause.  ECF No. 124 at 10.  The Government opposes McPherson's Motion.  ECF No. 130.  McPherson filed a Reply.  ECF No. 138.  The Court held a hearing on May 1, 2017.  ECF No. 140.

## II.   Discussion

### A.  The Original Wiretap Authorization From June 9, 2015 to July 8, 2015

McPherson argues that the Government's original wiretap application failed to demonstrate that the wiretap on Target Telephone #1 was necessary.  The Court disagrees.

### a.  Standard of Review for Considering a Motion to Suppress Wiretap Evidence

Title III of the Omnibus Crime Control and Safe Streets Act governs the use of wiretapping.[3]  "To obtain a wiretap, a law enforcement official must apply to a [U.S. District Court] judge for an order permitting the surveillance."  *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988) (citing 18 U.S.C. § 2518(1)).  Each wiretap application must meet several statutory requirements.  18 U.S.C. § 2518(1).

---

[3] *See* 18 U.S.C. §§ 2510–2522.

4

In addition to showing probable cause, 18 U.S.C. §§ 2518(1)(c) and (3)(c) together require a showing of necessity before a district court can issue a wiretap order. *See Carneiro*, 861 F.2d at 1176; *see also United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1110 (9th Cir. 2005). Under 18 U.S.C. § 2518(1)(c), a wiretap application must include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." A law enforcement officer typically includes this statement of facts in a sworn affidavit in support of the wiretap application. *See United States v. Christie*, 825 F.3d 1048, 1066 (9th Cir. 2016).

The issuing judge may conclude that the application satisfies the necessity requirement if he or she determines that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Wiretap evidence that the government obtains in violation of Title III must be suppressed. *See* 18 U.S.C. § 2515; *see United States v. Giordano*, 416 U.S. 505, 524–25, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

When considering a Motion to suppress wiretap evidence, the Court must apply a two-step approach. First, the Court must review de novo whether the application for a wiretap was submitted in compliance with 18 U.S.C. 2518(1)(c)—that is, whether it contained a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. *See United States v. Rodriguez*, 851 F.3d 931, 938 (9th Cir. 2017).

If the wiretap application meets the requirements of 18 U.S.C. § 2518(1)(c), then the Court must review the issuing judge's ultimate decision that the wiretap was necessary (as distinct from the facial sufficiency of the completeness of the statement of necessity contained in the application) pursuant to 18

U.S.C. § 2518(3)(c) for abuse of discretion. *See Christie*, 825 F.3d at 1066; *Rodriguez*, 851 F.3d at 938 (citing *Gonzalez, Inc.*, 412 F.3d at 1111-12).

An affidavit in support of a wiretap application must include "specific facts relevant to the particular circumstances" of the case and not just boilerplate conclusions regarding necessity that would be true of any investigation. *Rodriguez*, 851 F.3d at 939 (citing *United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001)). It is enough, however, if the application sketches the "nature and contours" of an investigation with enough specificity to enable a reviewing judge to reasonably ascertain whether the continued use of traditional surveillance would be fruitless. *United States v. Baker*, 589 F.2d 1008, 1011 (9th Cir. 1979).

The investigation of a conspiracy, such as here, impacts the Court's review and analysis. *United States v. Canales Gomez*, 358 F.3d 1221, 1226 (9th Cir. 2004); *United States v. McGuire*, 307 F.3d 1192, 1197-98 (9th Cir. 2002) (comparing the difficulties of investigating and prosecuting a conspiracy to slaying the Hydra of Greek mythology). Under Ninth Circuit precedent, when the Government pursues a conspiracy, it is entitled to more leeway in its investigative methods. *McGuire*, 307 F.3d at 1198. Furthermore, necessity for the wiretap is evaluated in light of the Government's need not merely to collect some evidence, but to "develop an effective case" against those involved in the conspiracy. *See Rodriguez*, 851 F.3d at 940 (citing *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006)). An "effective case" means "evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment." *McGuire*, 307 F.3d at 1198.

When reviewing an issuing judge's findings of necessity for abuse of discretion, the Court must employ a "common sense" approach to evaluate the reasonableness of the Government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use. *See Gonzalez*, *Inc.*, 412 F.3d at 1112.

6

This standard of review is deferential because the issuing judge has "considerable discretion" in finding necessity, "particularly when the case involves the investigation of a conspiracy." *Rodriguez*, 851 F.3d at 944; *McGuire*, 307 F.3d at 1197 ("The court authorizing a wiretap has considerable discretion … so the standard of review is deferential"). Although the wiretap should not ordinarily be the initial step in the investigation, law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." *McGuire*, 307 F.3d at 1196-97.

**b. Whether the Application for the Wiretap Order Provided a Full and Complete Statement of Necessity Sufficient to Satisfy 18 U.S.C. § 2518(1)(c)**

The Court begins by conducting a de novo review of the statements in the wiretap application and affidavit purporting to show necessity under 18 U.S.C. § 2518(1)(c). Based on the Court's de novo review, the Court finds that DEA Task Force Officer Grimmett's 47-page affidavit adequately described the DEA's use of various investigative techniques throughout its 14-month investigation of the McPherson drug trafficking organization, explained why those techniques did not achieve the objectives of the investigation, and explained why the DEA did not use other investigative techniques because they were deemed unlikely to achieve those objectives.

The Court concludes that Grimmett's affidavit demonstrated the requisite necessity. The affidavit recounted the traditional investigative methods the Government pursued before it applied for the wiretap. The DEA's investigation began in March 2014. The affidavit listed numerous investigative techniques that were actually used during this investigation. Those techniques included (1) confidential source (2) undercover agent (for controlled purchases) (3) physical surveillance (4) search warrants (5) trash searches (6) video surveillance systems and GPS tracking (7) pen registers, trap and trace devices, toll analysis and subscriber information, and (8) financial investigation. In addition, the affidavit described two

investigative techniques—interviews/grand jury subpoenas/immunity and mail cover requests—that were not used because the DEA determined that they were not likely to succeed.

### i. Broad Goals of the Investigation

As an initial matter, the Court addresses McPherson's argument that the Government's goals and objectives of the investigation were overly broad to the point of being flawed.  Grimmett's affidavit for Target Telephone #1 lists the following goals and objectives for the investigation:

1. [D]iscovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of Dennis MCPHERSON;

2. [D]iscovering the identities and roles of all suppliers of pharmaceutical narcotic controlled substances and identified conspirators;

3. [D]iscovering the identity of the main customers of Dennis MCPHERSON, Matthew MCPHERSON, Alex HONG, Kevin KONG and the others yet unknown;

4. [D]iscovering the stash locations where pharmaceutical narcotic controlled substances and/or other drugs are stored prior to distribution;

5. [D]iscovering the management and disposition of proceeds generated by the organization's narcotics trafficking; and

6. [O]btaining admissible evidence which demonstrates beyond a reasonable doubt that Dennis MCPHERSON and any later identified targets, committed the alleged violations of law set forth herein.

ECF No. 124-1 at 45-46.

The Ninth Circuit has approved in other cases similarly broad investigative goals in the conspiracy context.  *See Canales Gomez*, 358 F.3d at 1224 (affirming a wiretap order in a drug conspiracy investigation in which the government sought to identify the "full scope of the massive conspiracy under investigation," and to "obtain direct evidence that will convince a jury beyond a reasonable doubt of its existence"); *see also United States v. Bennett*, 219 F.3d 1117, 1121 n. 3 (9th Cir. 2000) (noting that Courts have consistently upheld wiretap applications seeking to discover the "full scope" of the conspiracy, including "major buyers, suppliers, and conspiracy members"); *United States v. Brone*, 792 F.2d 1504,

1505, 1506 (9th Cir. 1988) (affirming authorization of wiretap to "enable the agents to uncover the source of [the defendant's] narcotics or the modus operandi of the alleged conspiracy" and to "develop an effective case"); *United States v. Chan*, No. C 05-00375 SI, 2006 WL 1581946, at *6 (N.D. Cal. June 6, 2006) (denying motion to suppress wiretap evidence where investigatory goals of identifying conspirators and methods were very broad); *United States v. Ballesteros*, No. 13CR4514-BEN, 2015 WL 468373, at *6 (S.D. Cal. Feb. 3, 2015).

In light of the practical considerations of investigating a conspiracy, the Court finds that the investigative goals set forth in Grimmett's affidavit are appropriate.

### ii.    Confidential Source and Undercover Agent

The affidavit stated that the Government used one confidential source ("CS") and one undercover officer ("UC"). ECF No. 124-1 at 44, 49. The DEA's investigation began in March 2014 after the CS provided information about a potential drug trafficking organization operated by McPherson and his associates in Las Vegas. *Id*. at 26-27. Under DEA supervision, the CS made controlled purchases of oxycodone pills from McPherson. *Id*. at 27-28. In June 2014 the CS introduced the UC to McPherson. The affidavit stated, however, that this technique was of limited utility. *Id*. at 47-48. According to the affidavit, although the CS had been able to speak with McPherson directly, the CS had not been able to learn the inner workings of McPherson's drug trafficking organization. *Id*. at 48. The affidavit predicted that McPherson would not disclose the identities of suppliers or the inner workings of his drug trafficking organization to the CS because of their associate-type relationship. *Id*. at 47-48. The affidavit stated that narcotics organizations only allow trusted members to have intimate knowledge of the workings of the organizations. *Id*. As a result, the affidavit concluded that individuals like CS who are not closely tied to the organization would not likely be able to infiltrate the organization to gain details and information useful to further the investigation. *Id*.

The affidavit here did more than recite the inherent limitations of using confidential informants.  It explained in reasonable case-specific detail why the CS was unable or unlikely to succeed in achieving the goals and objectives of the investigation.  That is sufficient.  McPherson argues that the affidavit failed to contain any specific circumstances such as CS's motivation, any attempts by CS to learn the "inner workings" of the organization or future criminal activities, or whether the CS was ever in danger.  ECF No. 124 at 21-22.  Ninth Circuit precedent, however, has not required such a level of detail in a wiretap application.  *See, e.g.*, *United States v. Rivera*, 527 F.3d 891, 899 (9th Cir. 2008) ("Defendants contend that the affidavit should have provided more detail, such as why a confidential source was considered to be in too much danger, why other confidential sources were unwilling or too scared to infiltrate the Rivera organization, and why the government chose to deport a confidential source and a source of information. However, we have not required such a level of detail in a wiretap application").

McPherson also asserts that "[d]espite probable cause to arrest Mr. McPherson after any of the controlled buys, the government incredibly claims it could not obtain sufficient evidence without a wiretap."  ECF No. 124 at 23.  In essence, McPherson argues that because the DEA had success in achieving several goals of their investigation prior to seeking the wiretaps, the wiretaps therefore were not necessary.  Yet a wiretap can be necessary if it gives the Government the ability to put together an effective case—that is, evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment.  *See McGuire*, 307 F.3d at 1198 (holding that the defendant's argument that electronic surveillance was not necessary because the government had already obtained indictments without the surveillance was weak for it is "plain beyond doubt" that the existence of an indictment does not make wiretapping unnecessary); *see also United States v. Ballesteros*, No. 13CR4514-BEN, 2015 WL 468373, at *7 (S.D. Cal. Feb. 3, 2015) ("Even if an investigation has been successful enough to gain an indictment against one conspirator, 'it is plain beyond doubt that the existence of an indictment does not make

wiretapping unnecessary'").   In other words, where the investigation's goals and objectives remain unattained despite apparent success with traditional investigatory methods, courts may find necessity even though normal methods have generated enough evidence to arrest or indict the defendant or to obtain a search warrant.  *See*, *e.g.*, *United States v. Mandell*, 833 F.3d 816, 822 (7th Cir. 2016); *McGuire*, 307 F.3d at 1198 ("That there has been an indictment does not mean that a wiretap cannot gain evidence to make a prosecution more effective"); 1 James G. Carr et al., *The Law of Electronic Surveillance*, § 4:39 at 414 (Thomson Reuters, Feb. ed. 2017) ("Where a large conspiracy is the target of the surveillance, the fact that conventional methods have developed enough evidence to indict or even convict some of its members does not preclude a finding of necessity").

### iii.    Physical Surveillance

The affidavit stated, with respect to physical surveillance, that surveillance had been conducted on McPherson, McPherson's home, suspected associates, and a possible drug stash house location for this organization.  ECF No. 124-1 at 51.  According to the CS, McPherson was a long-time resident of Las Vegas.  *Id*.  As a result, the affidavit explained that the mere presence of officers and vehicles that were not recognized as belonging to known residents of McPherson's neighborhood or residences associated with his organization, were visibly conspicuous.  *Id*.  This made prolonged surveillance all but impossible.  *Id*.  The affidavit provided a specific example detailing how law enforcement members were apparently discovered while surveilling McPherson's home.  *Id*. at 51-52 ("pedestrians appeared to be very conscious of investigators' surveillance vehicles").

Moreover, the affidavit stated that McPherson appeared not only to be conscious of surveillance, but to have engaged in "counter-surveillance" techniques on several occasions.  *Id*. at 52-53. Consequently, the affidavit established that physical surveillance was of limited use and had been

11

unsuccessful in, *inter alia*, identifying all members of the conspiracy, including sources of supply.  The affidavit has explained in reasonable case-specific detail why physical surveillance was unable or unlikely to succeed in achieving the goals of this investigation.

### iv.    Search Warrants

For search warrants, the affidavit stated that "[s]earch warrants have not been executed in this investigation."  ECF No. 124-1 at 54.  That statement was not accurate.  Both parties agree.  ECF Nos. 130 at 11; 138 at 9.  The affidavit, however, discussed in an earlier section in considerable detail several successful search warrants executed by the United States Postal Inspectors.  *See* ECF No. 124-1 at 29-31.  The evidence (oxycodone pills) uncovered by executing these search warrants on mailed packages identified by the Inspectors was fruitful.  *Id*.  Indeed, it led to the DEA conducting video surveillance of the United States Postal Service mailing station which led to the identification of Susan Cope as the mailer of that package containing contraband.  *Id*.  Also, the DEA was able to link that contraband using other investigative techniques to a residence associated with McPherson.  *Id*.

The affidavit acknowledged that search warrants can lead to evidence of criminal activity.  ECF No. 124-1 at 54.  The results of the search warrants that were executed and detailed in the affidavit show this.  But the affidavit also explained that search warrants would not be effective at achieving the larger goals of this conspiracy investigation because members and associates of McPherson's drug trafficking organization rarely maintain large quantities of narcotics upon their persons or in their residences.  *Id*.  The affidavit specifically stated that as soon as "quantities of narcotics come into the possession of Dennis MCPHERSON and other TARGET SUBJECTS, they immediately begin to notify customers and quickly sell off the narcotics."  *Id*.  Because "[e]vidence seized would only implicate the individual directly associated with it, and not the entire organization," the affidavit concluded that search warrants in and of themselves, would not further the goals and objectives of this investigation.  *Id*.

### v.    Interviews/Grand Jury Subpoenas/Immunity

The affidavit stated that Grimmett believed grand jury investigation using subpoenas of individuals in McPherson's drug trafficking organization would not be successful because these individuals would likely invoke their Fifth Amendment privilege not to testify. *Id*. at 55-56. Moreover, the affidavit explained that the use of Grand Jury techniques would alert McPherson and his co-conspirators, both known and unknown, to the existence of the DEA's investigation. *Id*. The affidavit concluded that these techniques were likely to impede the government's investigative objectives at that time. *Id*. Having reviewed the affidavit, the Court finds that it gave appropriate weight to the success and limitations of the Grand Jury subpoena process in sufficient detail.

### vi.    Trash Searches

With respect to trash searches, the affidavit initially recited that based on Grimmett's experience and that of fellow officers, that suspected criminals involved in trafficking illegal narcotics rarely disposed of evidentiary documents and material which implicate other members of a conspiracy. ECF No. 124-1 at 56-57. The affidavit, however, listed an example from the investigation where Grimmett and fellow officers recovered trash/debris/waste from a trash can belonging to McPherson's home. *Id*. The trash pull was successful as the DEA was able to recover an empty oxycodone prescription bottle bearing the name a couple of potential sources, banking receipts, and additional papers bearing McPherson's name. *Id*. Even so, the affidavit explained that the items recovered only supported what the DEA had already determined; no new intelligence was gained. *Id*. The affidavit stated that the DEA would continue to use trash searches to further this investigation. Although the DEA had achieved some success using this investigative technique, the Court finds that the affidavit adequately explained the limitations of trash pulls in attaining the goals and objectives of the conspiracy investigation. *See Rodriguez*, 851 F.3d at

943 ("the mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap") (citing *United States v. Bennett*, 219 F.3d at 1122); *see also United States v. Cao*, 471 F.3d 1, 3 (1st Cir. 2006) ("partial success of the investigation [does] not mean that there was nothing more to be done").

### vii.    Other Surveillance Techniques

With respect to other surveillance techniques, the affidavit stated that although video surveillance systems may at times assist law enforcement in augmenting physical surveillance, it cannot fully uncover the scope of the drug trafficking organization. ECF No. 124-1 at 57-58. The affidavit specified that video surveillance revealed a high level of pedestrian and vehicular traffic at McPherson's home. *Id*. But the DEA was not able to identify who the persons were or their purpose for interacting with McPherson. *Id*.

The affidavit also explained that GPS tracking was being used along with the pen register and trap and trace device. *Id*. The affidavit then stated that "[a]lthough this has proven useful in locating FALCO it is not without limitations." *Id*. As McPherson notes, and the Government concedes, "Falco" appears to be a name from a different case. This error, McPherson argues, shows that this paragraph contained no case-specific circumstances because Grimmett pasted text about inherent limitations of the particular investigative technique from a previous application. ECF No. 124 at 26; 138 at 12-13.

McPherson's argument has some merit. However, the affidavit, as a whole, provided sufficient case-specific language to pass muster. ECF No. 124-1 at 43. Indeed, the affidavit discussed in an earlier section when Grimmett obtained authorization from this Court for "a pen register and trap and trace device with GPS precision location for Target Telephone #1" and that the information acquired "[did] corroborate that Dennis McPherson [was] utilizing Target Telephone #1 to facilitate the distributing of narcotics." *Id*.

14

The affidavit illustrated the inherent limitations of GPS tracking—i.e., it was insufficient to, among other things, prove the purpose of meetings between suspects being tracked. *Rivera*, 527 F.3d at 901.

### viii.    Pen Registers, Trap and Trace Devices, Toll Analysis, and Subscriber Information

The affidavit stated that the information obtained from the pen register and trap and trace devices with GPS precision location data helped to corroborate that McPherson was using Target Telephone #1 to facilitate the distribution of oxycodone. ECF No. 124-1 at 43. It also stated that data and call toll records helped identify contacts associated with McPherson, including Matthew McPherson and Susan Cope. *Id.* at 44. According to the affidavit, those investigative techniques were limited, however. For example, the affidavit stated that the pen register and trap and trace devices only provided a list of numbers called, but would not establish the identities of all the persons called or more importantly, the contents of the conversations. *Id.* at 59. Thus, the affidavit concluded that these tools could not by themselves achieve the goals of the investigation. *Id.*

McPherson argues that this section of the affidavit uses boiler plate language describing the inherent limitations of these techniques. But the affidavit read as a whole—and not in a piecemeal fashion—does provide sufficient case specific detail to satisfy this Court.

### ix.    Mail Cover Requests

The affidavit stated that the DEA had not used a mail cover at McPherson's home for two reasons. First, although the affidavit acknowledged that McPherson was utilizing the United States Postal Service as a conduit to distribute oxycodone pills, it noted that McPherson appeared to be doing so via a local post

15

office,[4] not his place of residence.[5]  Second, in the affidavit, Grimmett expressed his lack of confidence that the mail carrier could be relied upon and his concern that the mail carrier may compromise the DEA's investigation by alerting McPherson that he was being watched or investigated.  ECF No. 124-1 at 60.  Thus, the affidavit concluded that the risks of pursuing this investigative technique far outweighed the value.  *See United States v. Neel*, No. CR 14-38-BLG-SPW, 2015 WL 64971, at *8 (D. Mont. Jan. 5, 2015) ("[t]he use of a mail cover would not have revealed the full scope of the conspiracy").  The Court is satisfied with the Government's explanation as to why it did not use mail covers.

     x.     **Financial Investigation**

In regards to financial investigation, the affidavit stated that a financial investigation was currently being conducted on McPherson and his associates.  ECF No. 124-1 at 61.  In particular, the affidavit noted that investigators were trying to determine the manor, means, and which, if any, financial institutions were being utilized by the drug trafficking organization to launder proceeds from the narcotics business.  *Id.*; *Id.* at 33.  According to the affidavit, based on surveillance and the UC's involvement with the target subjects, the majority of the financial transactions involved were believed to be conducted in a "cash and carry" manor—i.e., target subjects used the cash obtained from their illegal activities to finance their day to day lifestyle.  *Id.*  As a result, the affidavit concluded that wiretapping was necessary to further the financial investigation.  *Id.*

---

[4] The Court notes that the affidavit discussed in detail the United States Postal Inspectors monitoring of items sent to and from various McPherson associates, such as Alex Hong, from USPS mailing stations based on the send and return addresses located on the outside of the mailed packages.  *See* ECF No. 124-1 at 30.

[5] A mail cover is a service provided by the United States Postal Service where a list of all the sender and receiver names and addresses on each piece of mail received at a particular location can be obtained.

McPherson argues that the affidavit omitted that the Government obtained financial institution documents through grand jury subpoenas, the names of banks used by McPherson and his associates, and their use of MoneyGram.  ECF No. 124 at 27, 33; 124-2 at 19.  To be sure, the affidavit does not appear to include that specific information.  But the first sentence of that section states "[a] financial investigation is currently being conducted" to determine, *inter alia*, which if any, financial institutions are being used by McPherson and the target subjects to launder proceeds from the narcotics business.  ECF No. 124-1 at 61.  That statement encompasses the subpoenas and other information.  Though, as always, more information could have been included, the Court is persuaded that Grimmett's affidavit contained "reasonable detail" and was sufficiently case-specific to satisfy Ninth Circuit precedent.  *See Garcia-Villalba*, 585 F.3d at 1229-1230; *see also  Rivera*, 527 F.3d at 899.

### xi.    Normal Investigative Procedures as a Whole

Viewing the success and limitations of these investigative procedures as a whole, the Court concludes that the affidavit contains a full and complete statement of the facts in compliance with 18 U.S.C. § 2518(1)(c).  The necessity requirement does not force the Government to exhaust all investigative techniques before turning to wiretapping.  *Christie*, 825 F.3d at 1069.  The necessity requirement must be interpreted in a practical and commonsense fashion.  *Bennett*, 219 F.3d at 1122 (citing *United States v. Bailey*, 607 F.2d 237, 241 (9th Cir. 1979)).  The wiretap statute "does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope."  *Id*. (citing *Baker*, 589 F.2d at 1013).  Further, the attainment of some degree of success from the use of traditional investigative methods does not alone extinguish the need for a wiretap.  *Rodriguez*, 851 F.3d at 943; *Bailey*, 607 F.2d at 242

("[T]he need for the wiretap arose when investigators, notwithstanding some success, had been unable, after six months of intensive effort, to learn of the full extent of the operation").

Here, the Government used most of the normal investigative procedures that it discussed, except for mail covers and interviews/grand jury techniques/immunity. The Government explained in the affidavit in sufficient detail why it did not use each of these techniques. *See Rodriguez*, 851 F.3d at 943 ("The affidavit need only explain why a particular investigative procedure reasonably appears 'unlikely to succeed'").

The Government also provided detailed explanations as to the results of the traditional investigative techniques that it did use. Traditional techniques provided information, including phone numbers, contacts of McPherson, and instances of specific drug transactions. As the affidavit demonstrates, however, normal investigative procedures did not reveal the full scope of the conspiracy—the identities and roles of many members of the organization remained unknown.

This is not a case of the Government failing to address the necessity of wiretaps, or seeking wiretap authorization after using only one or two normal investigative procedures without explaining why it did not use other procedures. To the contrary, here, the Government spent many pages describing the results of the normal investigative procedures it used and explained why it did not use other procedures. Based on this Court's de novo review, the Court concludes that the wiretap application and affidavit adequately explains why the interception of wire communications was necessary to investigate this conspiracy and the target subjects, and that they contained "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

/ / /

/ / /

### c.  Whether the Wiretap was Necessary

The Court turns next to the question of whether the issuing judge appropriately determined "on the basis of the facts submitted by the applicant [in the affidavit] that … normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See* 18 U.S.C. § 2518(3)(c).  The Court must review for abuse of discretion the issuing judge's decision to issue the wiretap order once she has found that the wiretap was necessary in the circumstances. *Rodriguez*, 851 F.3d at 944.

In undertaking this review, Ninth Circuit precedent requires the Court to use "a 'common sense approach' to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success." *Id*. (citing *Christie*, 825 F.3d at 1068).  Wiretap applications must contain more than "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures." *Blackmon*, 273 F.3d at 1210.  But minor deficiencies in detail will not doom an affidavit because courts evaluate "the level of detail in the affidavit as a whole," rather than piecemeal. *See Christie*, 825 F.3d at 1068.  The issuing judge has "considerable discretion in finding necessity, particularly when the case involves the investigation of a conspiracy," so the standard of review is deferential. *Rodriguez*, 851 F.3d at 944.

The Government applied for the original wiretap after 14 months of investigation.  While there is no minimum number of days of investigation required before the Government may apply for a wiretap authorization, the length of the investigation is a factor for courts to consider. *Rodriguez*, 851 F.3d at 944. Given the wide range of traditional techniques used in those 14 months of investigation, it is clear that the Government did not seek to use the wiretap as the initial step in its investigation. *Id*.

Here, Grimmett's affidavit showed that the Government used a range of traditional techniques, including a confidential source, pen registers and trap and trace devices, physical surveillance, financial

19

investigation, and trash searches before seeking authorization for electronic surveillance. The affidavit also explained why other techniques such as mail cover requests and interviews with witnesses/grand jury subpoenas/immunity would be unproductive.

While the affidavit does contain some boilerplate language, it also gives case-specific reasons why continued use of certain techniques would likely be ineffective without a wiretap. A mixture of boilerplate and case-specific information is acceptable and, indeed, sometimes unavoidable. *See, e.g.*, *United States v. Milton*, 153 F.3d 891, 895 (8th Cir. 1998) ("[D]rug investigations suffer from common investigatory problems… [and] [d]rug crime is necessarily harder to detect than other crimes because it is difficult to witness and does not create victims who are compelled to come forward and report the crime"); *see also* Carr et al., *supra*, § 4:39 at 419 ("[w]here … the showing of necessity was otherwise ample, the fact that, in one regard, a reviewing court finds the assertion as to a particular conventional investigative method unpersuasive, will not lead to suppression").

In this case, law enforcement officers specifically sought to gain evidence and knowledge of how McPherson and his network of associates were trafficking narcotics. As in *Rivera* and *Christie*, the Government could probably have relied on traditional techniques alone to successfully prosecute McPherson. *See Rivera*, 527 F.3d at 902; *Christie*, 825 F.3d at 1068. But the Government's legitimate interest extended beyond prosecuting McPherson; it encompassed exposing the entire suspected conspiracy and developing an "effective case" against its members. *Id.* Courts have "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of … other satellite conspirators." *Rivera*, 527 F.3d at 902 (citing *McGuire*, 307 F.3d at 1198).

After reviewing the affidavit, which include the purpose of the investigation and the information sought, this Court cannot say that the issuing judge abused her discretion in finding necessity under the circumstances presented here.

### d. Whether the Affidavit Supporting the Government's Original Wiretap Application Contains *Franks* Errors Sufficient to Defeat a Finding of Necessity

McPherson contends that he is entitled to a *Franks* hearing to flesh out the nature and extent of the defects in the affidavit supporting the Government's original wiretap application. For the reasons stated below, the Court disagrees.

To obtain a *Franks* hearing, a defendant must make "a substantial preliminary showing that a false statement was deliberately or recklessly included in an affidavit submitted in support of a wiretap order, and the false statement was material to the district court's finding of necessity."[6] *United States v. Staves*, 383 F.3d 977, 982 (9th Cir. 2004); *U.S. v. Ippolito*, 774 F.2d 1482 (9th Cir. 1985) (applying *Franks* to the showing of necessity required for a wiretap order).[7] False statements are material "if the wiretap application purged of the false statements would not support findings of probable cause and necessity." *Id*. Immaterial falsehoods, even if made deliberately, are not fatal. *See Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L. Ed. 2d 667 (1978) ("Allegations of negligence or innocent mistake are insufficient"); *see also U.S. v. Colonna*, 360 F.3d 1169 (10th Cir. 2004) ("misstatement in an affidavit that is merely the result of simple negligence or inadvertence … does not invalidate a warrant") *abrogated*

---

[6] 2 Carr et al., *supra*, § 6:31 at 70 (noting that recklessness, though not having a precise definition, has been described as acting with a high degree of awareness of probable falsity or as acting while entertaining serious doubts as to the truth).

[7] *See also United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986) (holding that a defendant must satisfy five specific requirements to be entitled to a *Franks* hearing: "(1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; [and] (5) the challenged statements must be necessary to find probable cause [and necessity]").

*on other grounds by United States v. Little*, 829 F.3d 1177, 1182 (10th Cir. 2016); 2 Carr et al., *supra*, § 6:31 at 73 ("Inaccuracies caused by inadvertence, failure to recognize mistakes, negligence … do not require a *Franks* inquiry").[8]

A material omission of information in an affidavit offered in support of an application for a wiretap may also trigger a *Franks* hearing. Where the defendant asserts an omission from the affidavit, the inquiry is whether the inclusion of the information in the affidavit would have led to a negative finding by issuing judge on necessity or probable cause. *See U.S. v. Chavez-Miranda*, 306 F.3d 973 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 1317, 154 L. Ed. 2d 1070 (U.S. 2003); *Ippolito*, 774 F.2d at 1486 n.1 (noting that the reviewing court should "insert the omitted truths" into the affidavit and determine whether necessity was shown); *U.S. v. Ailemen*, 986 F. Supp. 1228, 1235 (N.D. Cal. 1997) ("determination whether an omission or misstatement is material requires the reviewing court to hypothesize about the effect of such knowledge on the issuing court"). Thus, to prevail on a claim that the affidavit in support of the wiretap application omitted information, a defendant must show (1) that facts were omitted with the intent to make, or in reckless disregard of whether they would make, the affidavit misleading, and (2) that the affidavit, if supplemented by the omitted information, would not support a finding of necessity or probable cause.

McPherson contends that numerous *Franks* errors exist in the affidavit's sections on confidential source, undercover agent, physical surveillance, search warrants, interviews/grand jury subpoenas/immunity, trash searches, pen registers, trap and trace devices, toll analysis and subscriber information, mail cover requests, and financial investigation. ECF No. 138 at 16. The Court finds that McPherson's arguments that the affidavit contains deliberate or reckless material falsehoods or that the

---

[8] *United States v. Ventresca*, 380 U.S. 102, 108, 85 S. Ct. 741, 746, 13 L. Ed. 2d 684 (1965) ("affidavits for search warrants … must be tested and interpreted by … courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity … have no proper place in this area").

Government deliberately or recklessly omitted information that would have prevented an issuing judge from finding necessity are without merit.

With respect to the confidential source, McPherson asks this Court pursuant to Fed. R. Crim. Proc. 16(a)(1)(E) to provide the identity, history, and monetary compensation of the CS to McPherson's counsel to evaluate Grimmett's claims about whether the CS's reliability, past offenses, and lack of pending charges are accurate. *See* ECF No. 124 at 28-29. McPherson bases his request on the results of a Department of Justice Report auditing the DEA's confidential source program. *Id*. The affidavit, however, demonstrates that the CS was reliable and his information credible to a sufficient extent. The affidavit stated that "[a]ll information supplied to your affiant by the CS was thoroughly checked in order to confirm its validity." ECF No. 124-1 at 26. The DEA provided monetary compensation to the CS conditioned on the CS providing reliable and accurate information. *Id*. The affidavit also stated that "[t]he information provided by CS … has been corroborated by pen register, call detail records, telephone toll analysis, surveillances and controlled purchases of narcotics on several occasions." *Id*. at 46-47 ("CS has never intentionally provided false or misleading information to us reference this investigation").

Further, the affidavit stated that the CS had been working with the DEA off and on since 1992 and had proven to be reliable and credible. *Id*. at 47. The affidavit also detailed the CS's criminal history which includes "numerous arrests and convictions," including an arrest for embezzlement. *Id*. A crime of dishonesty is not fatal to the reliability of the informant's information because the affidavit included sufficient information to bolster the CS's credibility and reliability of the information he provided to the DEA. *See U.S. v. Elliott*, 322 F.3d 710, 716 (9th Cir. 2003); *see also United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986) (noting that an informant may be presumed trustworthy when he has previously provided accurate information). Moreover, McPherson neither directs this Court to any particular statement of the CS's in the affidavit that McPherson believes to be untrue, nor provides any

offer of proof, such as an affidavit or sworn or otherwise reliable statements of witnesses. *See Franks*, 438 U.S. at 171. McPherson's request for the identity, history, and monetary compensation of the CS is denied.

With respect to undercover agent, McPherson argues that the necessity portion of the affidavit failed to include a conversation recorded between the UC and McPherson about McPherson's money laundering through local casinos. As discussed above, courts, in conducting their necessity analysis, must review the affidavit as a whole. *See Rodriguez*, 851 F.3d at 942; *see also U.S. v. King*, 991 F. Supp. 77, 89 (E.D. N.Y. 1998) (noting that there is no need to repeat information already stated in the probable cause portion of the affidavit in the necessity portion). The recorded conversation between the UC and McPherson was disclosed in the affidavit. *See* ECF No. 124-1 at 33. As a result, the affidavit did not omit the information that McPherson suggests.

For physical surveillance, McPherson argues that the affidavit failed to include complete information about material surveillance. ECF No. 124 at 30. The Court finds that the omission was not material. The affidavit discussed two instances of physical surveillance of McPherson's residence which illustrated why the use of that technique was limited. ECF No. 124-1 at 51-52. The Court finds that the affidavit, if supplemented by the omitted information, would still support a finding of necessity.

For search warrants, McPherson is correct that the affidavit erroneously stated that "search warrants have not been executed in this investigation." *Id*. at 54. But this false statement is simply not material. The affidavit as a whole explained in case specific detail the multiple search warrants obtained and executed by United States Postal Inspectors on mail packages thought to contain oxycodone. Similarly, McPherson's argument that the affidavit omitted information about an additional trash pull conducted on

24

McPherson's home on May 27, 2015, is not a material omission.[9]  The Court finds that the inclusion of that information in the affidavit would not have led to a negative finding by the issuing judge on necessity.

With respect to pen registers, trap and trace devices, toll analysis and subscriber information, McPherson argues that the "entire affidavit omits the results of the pen register and trap and trace device surveillance." ECF No. 124 at 32.  As McPherson acknowledges, the affidavit stated in an earlier section that the information obtained from the pen register and trap and trace devices with GPS precision location data helped to corroborate that McPherson is using Target Telephone #1 to facilitate the distribution of oxycodone.  *Id.*  Although the affidavit only provided the general result, and not the specific results, it discussed in detail the data and call toll records, including calls going to and from Target Telephone #1. The affidavit stated that there were 10,567 calls and 1,075 text message communications to and from Target Telephone #1, including "360 voice calls and 27 text message communications to and from" a phone number associated with Matthew McPherson.  ECF No. 124-1 at 43.  The Court finds that the affidavit, even if supplemented with the specific results of the pen register and trap and trace device surveillance, would not have negated the finding of necessity by the issuing judge.  Put differently, the omission was not a material omission.[10]   In any event, it is not necessary that every single detail have been included in the affidavit.  *See, e.g.*,  *U.S. v. Yeje-Cabrera*, 430 F.3d 1, 9-10 (1st Cir. 2005)  (holding

---

[9] The Court also notes that the application and affidavit were filed on June 3, 2015—one week after the DEA conducted the trash pull.  As a practical matter and drawing upon common knowledge of the speed and efficiency at which the government works, that the trash pull was not included in the affidavit does not strike this Court as unreasonable.  *See Ventresca*, 380 U.S. at 108 ("affidavits for search warrants … must be tested and interpreted by … courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity … have no proper place in this area").

[10] The Court finds that the affidavit erroneously stated that court orders(s)—and not court order (singular)—for pen register and trap and trace devices had been issued.  The Court is not persuaded that this false statement is material.  *See United States v. Giovannelli*, 01 CR. 749 (JSR), 2004 WL 48869, at *2 (S.D.N.Y. Jan. 9, 2004) (holding that inaccuracies were *de minimis*).

that Title III does not obligate the government to divulge every fact discovered in the course of the investigation); *U.S. v. Gambardella*, 2009 WL 5217996, at *2-3 (D. Conn. 2009) (same).

For mail cover requests, McPherson contends that the Government omitted specific circumstances showing how the mail carrier could not be trusted which would have prevented a finding of necessity. McPherson neither alleges, nor argues that such an omission was deliberately or recklessly omitted. Even so, the Court finds that such information would not be material.

With respect to financial investigation, McPherson asserts that the affidavit omitted information about financial evidence already found through traditional investigation techniques. ECF No. 124 at 33. McPherson's argument fails for two reasons. First, McPherson does not contend that the Government deliberately or recklessly omitted information that would have prevented a finding of necessity. Second, the inclusion of the information about the subpoenas and the results thereof in the affidavit would not have led to a negative finding by the issuing judge on necessity. The affidavit stated that a financial investigation was currently being conducted on McPherson and his associates and that investigators were trying to determine the manor, means, and which, if any, financial institutions were being utilized by the drug trafficking organization to launder proceeds from the narcotics business. That statement encompasses the subpoenas and the results thereof.

In sum, even if the Court puts the misstatements to one side or inserts the challenged omissions, there remains sufficient content in the extension application to support a finding of necessity. Therefore, the Court finds that McPherson has not made the preliminary substantial showing that the affidavit (1) contained deliberately or recklessly false statements or misleading omissions, and (2) that the affidavit would not support a finding of necessity without the false information or with the omitted information. Accordingly, the Court denies McPherson's request for a *Franks* hearing.

/ / /

26

e.  **Whether the Government's Original Wiretap Application Lacked Probable Cause Due to Staleness or *Franks* Errors**

McPherson argues that the wiretap application lacked probable cause due to staleness and *Franks* errors.  For the reasons stated below, the Court is not persuaded.

i.  *The Wiretap Application was not based on Stale Information*

A reviewing court should uphold an issuing court's probable cause determination if the application for the wiretap provides a substantial basis sufficient to sustain a finding that an individual is committing, has committed, or is about to commit specified offenses; that communications related to the offense will be intercepted through the wiretap; and that the individual who is the focus of the wiretap investigation will use the tapped phone.  *See United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995); *see also* 18 U.S.C. §§ 2518(3), 2518(1)(b).  The Court's review of a finding of probable cause is deferential.  *See United States v. Lynch*, 437 F.3d 902, 912 (9th Cir. 2006); *United States v. Alvarez*, No. 14-CR-00120-EMC-1, 2016 WL 69901, at *11 (N.D. Cal. Jan. 6, 2016).

The standards and procedures by which a Judge determines probable cause to support issuance of a surveillance order are the same as those used in conventional search warrant cases.  Like affidavits for conventional search warrants, applications for electronic searches must be read "in a commonsense and realistic fashion."  *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir. 1985).

The Court finds that there is a substantial basis to support the issuing court's finding of probable cause.  The Government submitted a 47–page affidavit in support of its application to wiretap Target Telephone #1, the cell phone number utilized by McPherson.  After a 14-month investigation into McPherson and his network of associates, the Government submitted that there was probable cause to believe McPherson was running a narcotics drug trafficking organization in the Las Vegas area.  ECF No. 124-1 at 26.  The affidavit provided a sufficient amount of information in support, including: information

supplied by the CS—and confirmed by the DEA—that McPherson and his associates were involved in the illegal distribution of oxycodone; numerous calls where McPherson used Target Telephone #1 to discuss with the UC how McPherson was able to get more money when he sold the oxycodone pills out of state; evidence linking McPherson and various associates to the illegal sales/distribution of oxycodone after United States Postal Inspectors obtained and executed search warrants on mailed packages containing oxycodone; surveillance of controlled purchases involving McPherson, the UC, and the CS. These facts, among others, establish probable cause to issue the wiretap.

The affidavit was not based on stale information as McPherson asserts. ECF No. 124 at 34. The affidavit detailed an ongoing investigation, describing evidence of a pattern of suspect activity through May 2015—one month before the wiretap was authorized. *See Angulo-Lopez*, 791 F.2d at 1399 (finding search warrant not stale where probable cause is based on continuing pattern); *see also United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (holding that when the evidence sought is of an ongoing criminal business, even a two-year lapse may not render information stale); *see also United States v. Leasure*, 319 F.3d 1092, 1099 (9th Cir. 2003) ("When an affidavit 'establish[es] the existence of a widespread, firmly entrenched, and ongoing narcotics operation … staleness arguments lose much of their force'") (quoting *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1566 (9th Cir. 1989)).[11] Probable cause with respect to drug trafficking offenses may continue for "several weeks, if not months, of the last reported instance of suspect activity." *United States v. Pena-Torrecillas*, 658 F. App'x 864, 865 (9th Cir. 2016) (citing *Angulo–Lopez*, 791 F.2d at 1399).

---

[11] *See also U.S. v. Salamasina*, 615 F.3d 925 (8th Cir. 2010) (holding that a judge who issued a search warrant had substantial basis for concluding probable cause existed to believe that narcotics or evidence of illegal drug activities would be found in defendant's home, even though information about his drug activities was months old); *U.S. v. Harris*, 482 F.2d 1115 (3d Cir. 1973)("protracted and continuous activity is inherent in a large scale operation" where a defendant replenishes his supply of narcotics every two weeks); 1 William E. Ringel, Searches and Seizures Arrests and Confessions § 7:3 (2d ed. 2017) ("Challenges based on stale probable cause are less likely to be successful when … the criminal activity referred to in the affidavit is continuous conduct which the defendant is still likely to be engaged in at the time the warrant is executed").

McPherson argues that the last surveilled conversation between the UC and McPherson occurred on March 25, 2015, more than two months before the wiretap application. ECF No. 124 at 34. That period is insufficient to render the information stale in light of the crimes involved and the pattern of illegal conduct. There is no strict rule concerning the number of days between the date the application is presented and the last informational date. *See Pena-Torrecillas*, 658 F. App'x at 865; *United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004) ("[I]n cases involving ongoing narcotics businesses, lapses of several months—and up to two years in certain circumstances—are not sufficient to render the information in an affidavit too stale to support probable cause"), *modified*, 425 F.3d 1248 (9th Cir. 2005); *Greany*, 929 F.2d at 525 (evaluating staleness "in light of the particular facts of the case and the nature of the criminal activity and property sought" and holding that "[w]hen the evidence sought is of an ongoing criminal business," even a two-year lapse may not render information stale); *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988) ("The mere lapse of substantial amounts of time is not controlling in a question of staleness"). The length of this period depends upon the nature of the criminal activity.

Moreover, there is a difference between a single incident and a continuing enterprise. Narcotics conspiracies are a paradigm of continuing crimes. *U.S. v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993) ("[n]arcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness") (quoting *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990)); *United States v. Diaz*, 176 F.3d 52, 109 (2d Cir. 1999) (holding that intervals of weeks or months between last described act and application for a wiretap do not necessarily make the information stale).

The Court finds that the issuing court's probable cause findings as to the original order was proper and not an abuse of discretion.

**ii.**    *The Wiretap Application Does not Contain Franks Errors Sufficient to Defeat a Finding of Probable Cause*

McPherson argues that the affidavit's erroneous statement that McPherson received a phone call from an inmate at Clark County Detention Center on July 28, 2014, regarding a prescription from Dr. Holper constitutes a *Franks* violation and renders the affidavit stale. ECF Nos. 124 at 34-35; 124-1 at 44-45. To be sure, McPherson is correct that the date should be July 28, 2011—not July 28, 2014. The Government also agrees. ECF No. 130 at 20. Yet even if the Court corrected that particular section in its review, or removed it entirely, the affidavit would still demonstrate probable cause. In other words, the error is not material. The Court also notes that McPherson failed to show that the false statement was deliberately or recklessly included in the affidavit. In any event, the corrected section would not render the affidavit stale.

McPherson asks this Court to order disclosure of the identity, history, and monetary compensation of the CS. ECF No. 124 at 35. McPherson contends that without knowing the identity of the CS, McPherson cannot independently investigate the affidavit's claims regarding the CS. The Court notes that the affidavit has provided information on the criminal history of the CS. ECF No. 124-1 at 46-47. Also, the affidavit stated that the CS had a proven track record of reliability and provided detailed, predictive information that was corroborated by the DEA. *Id*. McPherson has not met the threshold requirements of *Franks*, that is, he has failed to show that the affiant deliberately misstated facts told to him by an informant. The Court is satisfied with that the affidavit's demonstration of the reliability and credibility of the CS and therefore denies McPherson's request to disclose the CS's identity.

/ / /

/ / /

**B. The Wiretap Extension Authorization  From July 17, 2015 to August 13, 2015**

   **a.  Whether the Government's Application for the Wiretap Extension Independently Establishes Necessity[12]**

An initial wiretap order may be extended upon the filing of a new application complying with the requirements of 18 U.S.C. § 2518(1) and the entry of findings by the court under 18 U.S.C. § 2518(3). *See* 18 U.S.C. § 2518(5).  In addition, the application for an extension order must, under 18 U.S.C. § 2518(f), either describe the results obtained through execution of the original order or explain the failure to obtain any results.

In applying for an extension of a previous wiretap order, the Government may not *summarily* rely on the necessity of the previous application as the basis for its claim to the necessity of the subsequent order.  *Garcia-Villalba*, 585 F.3d at 1231.  Each application must be assessed independently whether it separately satisfies the necessity requirement.  *Id.* at 1232; *Rodriguez*, 851 F.3d at 939.  But courts are not required to address an application in a vacuum.  *Id.*  Historical facts, including investigatory tactics, from previous applications, particularly those within the same investigation, may be relevant and considered by courts in reviewing an extension application if they bear on the Government's continued showing of necessity.  *Id.*  The extension affidavit herein incorporated by reference the affidavit in support of the original wiretap application and order.  ECF No. 124-1 at 309, 315.  What is more, an application for an extension order is not invalid solely because portions of a prior application have been included, as long as the application is otherwise adequate.  Indeed, there is nothing improper in including information from prior applications in the extension application where the later application is updated with information

---

[12]  Because the Court found that the original wiretap application was statutorily proper and that McPherson failed to meet his burden under *Franks*, the Court need not address McPherson's "taint" argument at this time.  ECF No. 124 at 38.

gathered during the continuing investigation, and shows that normal investigative methods are not adequate. *See Garcia-Villalba*, 585 F.3d at 1232; *see also Neel*, No. CR 14-38-BLG-SPW, 2015 WL 64971, at *10 (holding that even though the extension application repeated much of the same information made in the previous applications, it still independently demonstrated necessity); *United States v. Hernandez-Sendejas*, 268 F. Supp. 2d 1295, 1301 (D. Kan. 2003) ("It is true that the Government included in each application a great deal of information from prior applications, but there is nothing improper in that fact. Each succeeding affidavit was updated with information gathered in the ongoing investigation [which] … served to bolster the Government's claim that normal methods of investigation were not adequate").

The Court finds that the continuing need to wiretap Target Telephone #1 was thoroughly established in the extension application and affidavit. McPherson relies on *United States v. Santora* to argue that the government may not bootstrap necessity and probable cause showings in the extension application from the previous original wiretap application. 600 F.2d 1317 (9th Cir. 1979), *amended*, 609 F.2d 433 (9th Cir. 1979). In that case, the court found that the government's first affidavit had been sufficient to support the initial wiretap order over certain telephone lines. The government subsequently sought a new order seeking interceptions on different phones, while relying on statements made in the initial affidavit/application to the effect that normal investigative techniques had failed. The court found the subsequent applications deficient. The court required that an independent analysis as to the utility of conventional investigative techniques be made as to conspirators implicated in the subsequent applications.

In the instant case, on the contrary, the Government did not seek to wiretap the telephone of Mark Lloyd, Susan Cope, or any other of the defendants, but merely to listen to their conversations about narcotics trafficking on Target Telephone #1—McPherson's cell phone number. The extension

application sought an order to continue wiretapping that same cell phone number. *Santora* does not apply to the facts of this case. *See United States v. Chan*, No. 96-350 WBS, 2006 WL 278582, at *2 (E.D. Cal. Feb. 3, 2006) ("[Santora] stand[s] for the proposition that the government may not simply transfer a showing of necessity that merited a court authorization for a wire intercept of one conspirator's phone to *another phone* belonging to another co-conspirator"); *see also United States v. Van Horn*, 579 F. Supp. 804, 812 (D. Neb. 1984) ("*Santora* does not apply to extensions of existing taps"), *aff'd sub nom. United States v. Womochil*, 778 F.2d 1311 (8th Cir. 1985).[13]

Here, in addition to many of the same persistent conditions which previously inhibited the DEA's ability to infiltrate or prosecute McPherson's drug trafficking organization, Grimmett's affidavit in support of the extension application also alleged new information relevant to the necessity showing. After conducting the initial intercept, the DEA was able to obtain useful evidence about the drug trafficking organization and its members. ECF No. 124-1 at 315-316. For example, the DEA was able to identify some previously unknown contacts, such as Katherine Chatman, as participating in some or all of the target offenses. *Id*. at 322, 324-325.

However, the affidavit noted that the individuals involved in the intercepted communications took steps to hide their tracks by using phones subscribed in other names, or with no subscriber information at all. ECF No. 124-1 at 316. As a result, the affidavit explained that when a pertinent call is received, identification of the caller is not simply a matter of obtaining subscriber information; extensive follow up investigation is often required. *Id*. at 316. According to the affidavit, some of the callers had only recently

---

[13]  *See also United States v. Tufaro*, 593 F. Supp. 476, 490-491 (S.D.N.Y. 1983), *aff'd*, 762 F.2d 991 (2d Cir. 1985); *United States v. Gambale*, 610 F. Supp. 1515, 1541 (D. Mass. 1985) ("*Santora* … does not apply to … the overhearing of additional suspects at locations where electronic surveillance was extended"); *United States v. Welty*, No. CRIM. 11-10212-JLT, 2013 WL 690528, at *2 (D. Mass. Feb. 26, 2013) (holding that the rule that a showing of necessity made in a prior wiretap application alone is insufficient in and of itself to support a subsequent and separate application does not apply where the subsequent application is simply an expansion of the predecessor application").

been intercepted and investigators had not yet had time to develop information regarding their true identities. *Id.* Thus, the affidavit stated that the continued interception of Target Telephone #1 was needed to provide additional information and clues to assist in identifying these individuals, as well as additional criminal associates. *Id.* The affidavit indicated that the DEA was also able to formulate different approaches to their other surveillance techniques based on the information gathered from intercepting wire communications. *Id.* at 317-318.

The extension affidavit also recited that McPherson was involved in the distribution of other "pharmaceutical products" such as pills of Soma (Carisoprodol), Adderall, Percocet, Fentanyl, and Xanax. *Id.* at 322. The affidavit stated that McPherson was now receiving pharmaceutical products from other countries. *Id.* at 322, 351. The affidavit stated that the CS who had initially provided information to the DEA moved out of Nevada and was no longer able to assist with gathering intelligence on McPherson and his associates. *Id.* at 338. Also, the affidavit indicated that the UC who conducted controlled purchases of oxycodone from McPherson and had discussions with McPherson over the phone regarding, *inter alia*, McPherson's preference for selling narcotics out of state, was no longer part of the DEA Las Vegas District Office Task Force. *Id.* at 340.

The affidavit explained why it was difficult for any CS or UC to infiltrate McPherson's drug trafficking organization, and why the use of these techniques was limited and unlikely to succeed in furthering the goals of the investigation. *Id.* at 337-340. The affidavit concluded that further interception was necessary to gather evidence as to details regarding the narcotics supply chain, and the money laundering aspects of McPherson and his associates. ECF No. 124-1 at 316. The DEA here continued to attempt traditional investigative techniques, including physical surveillance and trash searches, in its drug conspiracy investigation. *Id.* at 317, 348. It was evident from Grimmett's affidavit that the DEA, despite efforts subsequent to the initial wiretap order, could not succeed in extirpating the narcotics conspiracy

short of continued wiretap surveillance. *McGuire*, 307 F.3d at 1198 fn. 3 ("It is one of the first duties of every government to extirpate gangs of thieves").

The extension affidavit, contrary to McPherson's argument, does not depend solely on the facts set out in the preceding affidavit which the Court found sufficient to justify surveillance. The affidavit was based in part on information learned by new and further investigation. Indeed, the affidavit provided in detail the results thus far obtained from the wiretap interceptions under the original application order. *See, e.g.*, ECF No. 124-1 at 315, 322-323. McPherson's arguments that the extension affidavit did not contain any specific circumstances regarding the necessity requirement or that the affidavit "adds little to his original necessity information" are without merit. *See Garcia-Villalba*, 585 F.3d at 1232; *see also Neel*, No. CR 14-38-BLG-SPW, 2015 WL 64971, at *10. The Ninth Circuit affords the Government wide leeway when investigating drug conspiracies. *See McGuire*, 307 F.3d at 1198. Moreover, pursuant to 18 U.S.C. § 2518(f), the extension affidavit provided in detail the results obtained through the execution of the original wiretap order. *See, e.g.*, ECF No. 124-1 at 315, 322-323. Accordingly, based on this Court's de novo review of the wiretap extension application, the Court finds that the wiretap extension satisfied the statutory requirements of Section 2518(1)(c). A full and complete statement of facts was submitted to the issuing judge under § 2518(1)(c).

This Court must also review the issuing court's ultimate decision to authorize a wiretap under § 2518(3)(c) for an abuse of discretion. *See Rodriguez*, 851 F.3d at 938. In assessing the findings of necessity, the Court must employ a "common sense" approach to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use. *See Christie*, 825 F.3d at 1068.

The Court finds that the issuing judge acted within his discretion in approving the wiretap extension. The same conditions existed which had previously made infiltration and physical surveillance difficult. But even in the face of new information uncovered as a result of the original wiretap, it was evident that the conspiracy had neither been extinguished, nor had all its members been identified.  Target members of the conspiracy continued to engage in illicit narcotics transactions, and the DEA also discovered new evidence of previously unknown customers and co-conspirators while monitoring the intercepted communications.  Further, even though "probable cause to arrest Dennis MCPHERSON [had] been developed," because of the special dangers involved in conspiracies and the wide leeway the Court affords the government in such cases, the Ninth Circuit has "consistently upheld findings of necessity where traditional investigative techniques lead only to the apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of … other satellite conspirators." *Rivera*, 527 F.3d at 902 (quoting *McGuire*, 307 F.3d at 1198).  Neither does the fact that the DEA had some success employing other investigative techniques foreclose the granting of the wiretap extension in this case.  In the face of this new evidence and continued criminal conduct, it cannot be said that the issuing court abused its discretion.  The decision to approve the wiretap extension was amply supported by the showing of necessity.  And under Ninth Circuit precedent, that decision is entitled to deference.

/ / /

/ / /

/ / /

**b. Whether the Extension Application Contains Numerous *Franks* Errors, Defeating a Finding of Necessity[14]**

To obtain a *Franks* hearing, a defendant must make "a substantial preliminary showing that a false statement was deliberately or recklessly included in an affidavit submitted in support of a wiretap order, and the false statement was material to the district court's finding of necessity."  *Staves*, 383 F.3d at 982. False statements are material "if the wiretap application purged of the false statements would not support findings of probable cause and necessity."  *Id.*  To prevail on a claim that the affidavit in support of the wiretap application omitted information, a defendant must show (1) that facts were omitted with the intent to make, or in reckless disregard of whether they would make, the affidavit misleading, and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of necessity or probable cause.  *See Ippolito*, 774 F.2d at 1486-87 (holding that the reviewing court must put the challenged misstatements and omissions to one side and determine whether there remains sufficient content in the warrant application to support a finding of necessity); *see also Perdomo*, 800 F.2d at 920.

The Court finds that McPherson is not entitled to a *Franks* hearing.  McPherson has not met his burden to substantially show that (1) Grimmett's affidavit in support of the extension application contains intentionally or recklessly false statements or misleading omissions, and (2) that the affidavit cannot support a finding of necessity without the allegedly false information or with the omitted information.

---

[14] At the hearing on May 1, 2017, the parties agreed that for the limited purpose of determining whether McPherson has met his burden under *Franks* with respect to the extension application, the Court must assume that the original wiretap affidavit was not attached to the filed extension application even though the extension affidavit stated that the original wiretap affidavit was (exhibit b).  ECF No. 124-1 at 309, 315.  However, even if the Court assumes that, it may still keep in mind historical facts from the previous application when considering whether McPherson has met his burden under *Franks*.  The extension affidavit stated that "[t]he affidavit in support of the application and order for CCA-375-JAD is attached hereto *and* incorporated herein by reference."  *Id.* (emphasis added).  Whether the original affidavit was attached is beside the point; the extension affidavit incorporated the original affidavit by reference.  The original affidavit was under seal in the file.

McPherson requests that the identity of the CS be provided.  The Court denies McPherson's request for the same reasons it denied his identical request with respect to the original wiretap application.  The extension affidavit demonstrated to a sufficient extent the reliability and credibility of the CS.  ECF No. 124-1 at 335-336.   McPherson also incorporates his *Franks* claims regarding undercover agents, interviews and grand jury testimony, other surveillance, pen registers or trace and trap devices, and mail covers, as set forth in the original affidavit.   However, the Court found that McPherson failed to substantially show that the affidavit pertaining to those sections contained intentionally or recklessly false statement or misleading omissions, or that the affidavit could support a finding of necessity without the allegedly false or omitted information.  Further, McPherson's contention that "[n]othing in these sections changed from the original affidavit" is not entirely accurate.  ECF No. 124 at 42.  For example, the undercover agent section stated that "[t]he UC is no longer employed as a member of the DEA LVDO TDS Task Force and is not in an occupational position to assist with the furtherance of the investigations." ECF No. 124-1 at 340.  The mail cover section stated "during recent authorized intercepts, Investigators have intercepted telephone calls where McPherson has admitted to using a fictitious name when mailing out packages to co-conspirators in Washington." *Id*. at 352.

With respect to physical surveillances, the extension affidavit provided case-specific details sufficient to satisfy the Court.  McPherson's argument that the physical surveillance section omitted at least four physical surveillances of McPherson is not completely accurate.  ECF Nos. 124 at 42; 138 at 21.  The affidavit provided in detail instances when the DEA surveilled McPherson such as when he flew from Las Vegas to Seattle to deliver 800 oxycodone pills to his associate.  ECF No. 124-1 at 317-318. The affidavit also included surveillance conducted simultaneously on Alex Hong in Seattle and McPherson in Las Vegas visiting banks following intercepted phone calls between them.  *Id*. at 321.  The affidavit need not include every instance of physical surveillance of McPherson.   The Court is not

persuaded by McPherson's argument because the omissions were not material.  McPherson neither argues nor alleges that the omissions were made with the intent to make, or in reckless disregard of whether they would make, the affidavit misleading.

The Court also does not agree with McPherson's argument regarding search warrants.  ECF Nos. 124 at 43; 138 at 22.  The extension affidavit did discuss a specific instance of the use of a search warrant.  For example, the extension affidavit stated that a search warrant was executed on a mailed package sent from McPherson to his associates on June 16, 2015 that uncovered 200 oxycodone pills.  ECF No. 124-1 at 320, 343.  The Court's review is not piecemeal; it must examine the extension affidavit as a whole.  Furthermore, the Court is not required to address the extension application in a vacuum ignoring historical and relevant facts from the previous application.  *Garcia-Villalba*, 585 F.3d at 1231.  In any event, McPherson does not show that the omissions were made with the intent to make, or in reckless disregard of whether they would make, the affidavit misleading.

With respect to financial investigation, McPherson argues that the affidavit omitted information regarding grand jury subpoenas served on various banks.  ECF Nos. 124 at 43; 138 at 23-24.  The affidavit stated, *inter alia*, that "[a] financial investigation is currently being conducted on Dennis MCPHERSON and the other TARGET SUBJECTS" and that "[i]t appears through surveillance … that the majority of the finances involved in this narcotics trafficking organization are using local banking institutions in Nevada and Washington to transfer funds among the TARGET SUBJECTS involved[.]"  *Id*. at 318, 320, 353.  The omission of grand jury subpoenas results is not fatal.  Even if included, the Court finds that it would not negate a finding of necessity by the issuing judge.  McPherson fails to argue that the omissions were made with the intent to make, or in reckless disregard of whether they would make, the affidavit misleading.  In sum, the Court finds that even if it puts the challenged misstatements to one side or inserts

the "omitted truths," there remains sufficient content in the extension application to support a finding of necessity.

The Court finds that McPherson has not met his burden to make a "substantial showing" under *Franks*. Accordingly, the Court denies McPherson's request for a *Franks* hearing.

### c. Whether the Government's Wiretap *Extension* Independently Establishes Probable Cause

McPherson argues that the wiretap extension lacked probable cause due to the "taint" from the improperly granted original wiretap. ECF Nos. 124 at 43; 138 at 25. The Court has found that the original wiretap application was properly granted, and therefore need not consider McPherson's taint argument.

The Court is unpersuaded by McPherson's argument that the wiretap extension lacked probable cause because there was no specific section addressing Section 2518(1)(f)'s requirement. ECF No. 138 at 25. The affidavit as a whole provided detailed results obtained from the original wire interception. *See, e.g.*, ECF No. 124-1 at 315, 322-324. The affidavit stated "[s]ince the wire intercept was initiated approximately six thousand three hundred ninety (6390) wire communications over Target Telephone #1 have been intercepted. Approximately two thousand ten (2010) of these calls pertained to narcotics and/or other criminal activity." ECF No. 124-1 at 315. The affidavit also stated that "[o]n June 10, 2015, a series of phone calls between MCPHERSON and HONG was intercepted." *Id*. at 316. The affidavit then detailed the content of the intercepted calls. *Id*. at 316-318. The extension affidavit provides more than enough information to satisfy § 2518(1)(f).

Looking to the four corners of the wiretap application, the Court finds that there is a "substantial basis" for the issuing court's findings of probable cause. *Meling*, 47 F.3d at 1552. The Court's review of a finding of probable cause is deferential. *Lynch*, 437 F.3d at 912. Here, there was probable cause for the issuing court to believe that McPherson and his network of associates were "committing, has committed,

40

or is about to commit" specified drug trafficking related offenses and that communications relevant to those offenses would be intercepted through the continued interception of wire communications over Target Telephone #1.

**C.  Whether the "Good Faith" Exception Set Forth in *U.S. v. Leon* Applies to Wiretaps**

As McPherson notes, the Ninth Circuit has not decided whether the "good faith" exception, set forth in *United States v. Leon*, 468 U.S. 897 (1984), applies to wiretaps.  ECF No. 124 at 44-45.  Other circuits are split.  *Id*.  Because the Court finds that the original wiretap application and extension were proper, there is no need to address this issue at this time.

ACCORDINGLY, and for good cause shown,

IT IS HEREBY RECOMMENDED that McPherson's Motion to Suppress (ECF No. 124) and Co-Defendants' joinders (ECF Nos. 125, 128, 132) be DENIED.

IT IS SO RECOMMENDED.

DATED this 8th day of May, 2017.


_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE